ORIGINAL

**SEALED**

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

2016 NOV 16  PM 2: 26

DEPUTY CLERK_____

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ALAN ANDREW BEAUCHAMP (01)<br>RICHARD FERDINAND TOUSSAINT, JR. (02)<br>WADE NEAL BARKER (03)<br>WILTON MCPHERSON BURT (04)<br>ANDREA KAY SMITH (05)<br>CARLI ADELE HEMPEL (06)<br>KELLY WADE LOTER (07)<br>JACKSON JACOB (08)<br>DOUGLAS SUNG WON (09)<br>MICHAEL BASSEM RIMLAWI (10)<br>DAVID DAESUNG KIM (11)<br>WILLIAM DANIEL NICHOLSON IV (12)<br>SHAWN MARK HENRY (13)<br>MRUGESHKUMAR KUMAR SHAH (14)<br>GERALD PETER FOOX (15)<br>FRANK GONZALES JR. (16)<br>ISRAEL ORTIZ (17)<br>IRIS KATHLEEN FORREST (18)<br>ANDREW JONATHAN HILLMAN (19)<br>SEMYON NAROSOV (20)<br>ROYCE VAUGHN BICKLEIN (21) | CRIMINAL NO.<br><br>**TO BE FILED UNDER SEAL**<br><br>**3 - 16 CR - 0 5 1 6 D** |

INDICTMENT

The Grand Jury charges:

At all times material to this Indictment, unless otherwise specified:

**General Allegations**

1.    Forest Park Medical Center Dallas (FPMC) was a physician owned, surgical hospital located at 11990 North Central Expressway, Dallas, Texas.  It opened in March 2009.

Indictment – Page 1

2.    Prior to its opening and continuing into 2013, FPMC, acting through its owners and managers, agreed to pay and did pay approximately $40 million in bribes and kickbacks to surgeons, primary care physicians, chiropractors, lawyers, workers' compensation preauthorization specialists, and others known and unknown to the Grand Jury in exchange for those individuals referring certain patients to FPMC. Those patients were primarily ones with high-reimbursing out-of-network private insurance benefits or benefits under certain federally-funded programs.

3.    At the same time, FPMC's owners, managers, and employees attempted to sell patients with lower-reimbursing insurance coverage, namely unwitting Medicare and Medicaid beneficiaries, to other facilities in exchange for cash.

4.    As a result of the bribes, kickbacks, and other inducements, FPMC billed such patients' insurance plans and programs well over half-a-billion dollars and collected over two hundred million dollars in paid claims, from approximately 2009 to 2013.

## Victims

5.    The Federal Employee Compensation Act ("FECA") was a federally-funded healthcare program as described in 20 CFR 10.0 that provided monetary compensation, medical care, and vocational rehabilitation to civilian employees of the United States Government, including Postal Service employees, for disability due to personal injury or disease sustained while in the performance of duty. The FECA program was administered by the Department of Labor, Office of Workers' Compensation Programs ("DOL-OWCP"). FECA was a "Federal healthcare program" as defined by 42 U.S.C. § 1320a-7b(f).

Indictment – Page 2

6.      TRICARE was a healthcare program of the United States Department of Defense (DoD) Military Health System that provided coverage for DoD beneficiaries world-wide, including active duty service members, National Guard and Reserve members, retirees, their dependents, and survivors.  The Defense Health Agency (DHA), an agency of the DoD, was the military entity responsible for overseeing and administering the TRICARE program.  TRICARE was a "Federal healthcare program" as defined by 42 U.S.C. § 1320a-7b(f).

7.      The Medicare Program (Medicare) was a federally-funded health care program providing benefits to persons who were over the age of 65 or disabled.  Medicare was a "Federal healthcare program" as defined by 42 U.S.C. § 1320a-7b(f).

8.      The Texas Medicaid Program (Medicaid) was a state program jointly funded by the State of Texas and the federal government that provided medical and related services to families with dependent children, and aged, blind, or disabled individuals whose income and other financial and economic resources were insufficient for them to meet the cost of necessary medical services.  Medicaid was a "Federal healthcare program" as defined by 42 U.S.C. § 1320a-7b(f).

9.      The Federal Employees Health Benefits Program (FEHBP) was a federally-funded health benefit program provided by the federal government for federal employees, retirees, and their eligible spouses and dependent children.  The Office of Personnel Management (OPM) administered the FEHBP.  OPM contracted with a number of different health insurance plans to pay healthcare claims on behalf of the FEHBP.

10.     UnitedHealthcare was a health care insurance company.  Among other things, it acted as a third party administrator for insurance plans and programs that cities, school

Indictment -- Page 3

districts, corporations, and small businesses offered to their employees. These insurance plans and programs were funded by the employer and their employees.

11.    Aetna was a health care insurance company. Among other things, it acted as a third party administrator for insurance plans and programs that cities, school districts, corporations, and small businesses offered to their employees. These insurance plans and programs were funded by the employer and their employees.

12.    Cigna was a health care insurance company. Among other things, it acted as a third party administrator for insurance plans and programs that cities, school districts, corporations, and small businesses offered to their employees. These insurance plans and programs were funded by the employer and their employees.

### Relevant Entities

13.    FPMC was founded by **Richard Ferdinand Toussaint, Jr.**, **Wade Neal Barker**, **Alan Andrew Beauchamp**, **Wilton McPherson Burt**, and others. It was managed by **Beauchamp** and **Burt**.

14.    Unique Healthcare (Unique) was a shell entity owned by FPMC employee **Andrea Kay Smith**. The coconspirators created Unique to funnel bribe and kickback payments to surgeons in exchange for those individuals referring patients to FPMC.

15.    Adelaide Business Solutions was a shell entity created by certain coconspirators and owned by **Jackson Jacob**. Certain coconspirators used Adelaide Business Solutions, along with another of **Jacob**'s companies (collectively Adelaide), to funnel bribe and kickback payments to surgeons, primary care physicians, chiropractors, lawyers, workers' compensation preauthorization specialists, and others in exchange for those

Indictment – Page 4

individuals referring patients to FPMC or to surgeons who used the hospital's facilities to perform certain medical procedures, including surgeries.

16.    Entity A, a company known to the Grand Jury, was a commercial real estate group that provided commercial real estate services to FPMC and was used by the coconspirators as a conduit for bribe and kickback payments.

## Defendants

17.    **Richard Ferdinand Toussaint, Jr.**, an anesthesiologist, founded and co-owned FPMC, and at all times relevant to this Indictment was the president of the hospital's board of directors.  **Toussaint** also founded and co-owned Entity A.

18.    **Wade Neal Barker**, a bariatric surgeon, founded and co-owned FPMC, and at all times relevant to this Indictment sat on the hospital's board of directors.  **Barker** also founded and co-owned Entity A.

19.    **Alan Andrew Beauchamp** was FPMC's Chief Operating Officer and held an investment interest in FPMC through the hospital's management company.

20.    **Wilton McPherson Burt** was a Managing Partner of FPMC and held an investment interest in FPMC through the hospital's management company.

21.    **Andrea Kay Smith** was FPMC's Referral Coordinator.  She tracked surgeries and referrals so surgeons and referral sources could receive "credit."

22.    **Carli Adele Hempel** was FPMC's Director of Bariatric Services.  Among other things, she led the efforts to sell Medicare and Medicaid referrals from certain coconspirators to a non-FPMC facility.

23.    **Kelly Wade Loter** owned an advertising agency that received bribe and kickback payments on behalf of physicians.

Indictment – Page 5

24.     **Jackson Jacob** paid bribe and kickback payments to surgeons and other referral sources on behalf of FPMC's owners and managers.

25.     **Douglas Sung Won** was a spinal surgeon who received bribe and kickback payments in exchange for referring his patients to FPMC.  He did not invest in FPMC.

26.     **Michael Bassem Rimlawi** was a spinal surgeon who received bribe and kickback payments in exchange for referring his patients to FPMC.  He did not invest in FPMC.

27.     **David Daesung Kim**, an investor in FPMC, was a bariatric surgeon who received bribe and kickback payments in exchange for referring his patients to FPMC.

28.     **William Daniel Nicholson IV**, an investor in FPMC, was a bariatric surgeon who received bribe and kickback payments in exchange for referring his patients to FPMC.

29.     **Shawn Mark Henry**, an investor in FPMC, was a spinal surgeon who received bribe and kickback payments in exchange for referring his patients to FPMC.

30.     **Mrugeshkumar Kumar Shah** was a pain management doctor who received bribe and kickback payments in exchange for referring his patients to FPMC or to surgeons who performed medical procedures, including surgeries, at the hospital.  He did not invest in FPMC.

31.     **Gerald Peter Foox**, a physician who owned an orthopedic clinic, received bribe and kickback payments in exchange for referring patients, including his patients, to FPMC or to surgeons who performed medical procedures, including surgeries, at the hospital.  He did not invest in FPMC.

32.     **Frank Gonzales Jr.** was a chiropractor who received bribe and kickback payments in exchange for referring patients, including his patients, to FPMC or to surgeons who performed medical procedures, including surgeries, at the hospital.

33. **Israel Ortiz** owned a clinic that received bribe and kickback payments for referring its patients to FPMC or to surgeons who performed medical procedures, including surgeries, at the hospital.

34. **Iris Kathleen Forrest** was a worker's compensation preauthorization specialist who received bribe and kickback payments in exchange for referring patients, including those she was preauthorizing, to FPMC or to surgeons who performed medical procedures, including surgeries, at the hospital.

35. **Andrew Jonathan Hillman** and **Semyon Narosov**, who collectively controlled a hospital consulting company, received bribe and kickback payments in exchange for referring patients to FPMC or to surgeons who performed medical procedures, including surgeries, at the hospital.

36. **Royce Vaughn Bicklein** was a workers' compensation lawyer who received bribe and kickback payments in exchange for referring patients, including his clients, to FPMC or to surgeons who performed medical procedures, including surgeries, at the hospital.

## FPMC's Formation

37. FPMC was formed by **Barker**, **Toussaint**, **Beauchamp**, **Burt**, and others as an out-of-network hospital.

38. Out-of-network hospitals did not agree with insurance plans and programs to accept set reimbursement rates for services provided to covered patients. In-network hospitals, by contrast, were part of a plan's network of providers with whom the plan had contractually negotiated the reimbursement rates it would pay, usually at a significant discount. As a result, hospitals that remained out-of-network were free to set their own

Indictment – Page 7

prices for services and were generally reimbursed at substantially higher rates than in-network providers.

39.    While many insurance plans offered insureds both in-network and out-of-network benefits, insureds that chose to have procedures done at out-of-network hospitals were generally required to pay a substantially higher portion of the hospital's bill out-of-pocket than patients that went to in-network facilities—generally 20% to 50% of the hospital's total charges.  The purpose of this higher payment was to encourage the use of in-network providers and offset the exorbitant reimbursement rates paid to out-of-network providers, which kept patients' insurance costs down.

40.    FPMC's strategy was to maximize profit for physician investors by refusing to join the networks of insurance plans for a period of time after its formation, allowing its owners and managers to enrich themselves through out-of-network billing and reimbursement.

41.    Based on their experiences at prior out-of-network hospitals, **Barker**, **Toussaint**, **Beauchamp**, **Burt**, and other conspirators knew that such hospitals sometimes pay bribes and kickbacks, and waive or reduce patients' coinsurance, to secure patient volume.

**<u>Count One</u>**
**Conspiracy to Pay and Receive**
**Health Care Bribes and Kickbacks**
**[Violation of 18 U.S.C. § 371]**

42.    Paragraphs 1 through 41 of this Indictment are realleged and incorporated by reference as if set forth fully herein.

43.    From in or around early 2008, through in or about January 2013, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of

Texas and elsewhere, the defendants **Toussaint, Barker, Beauchamp, Burt, Andrea Smith, Hempel, Loter, Jacob, Won, Rimlawi, Kim, Nicholson, Henry, Shah, Foox, Gonzales, Ortiz, Forrest, Hillman, Narosov, Bicklein**, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other to commit certain offenses against the United States, that is:

a.    to violate 42 U.S.C. § 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, specifically, bribes and kickbacks, directly and indirectly, overtly and covertly, to induce the recipients to refer individuals to FPMC and to physicians who performed medical procedures at the hospital for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, namely, FECA and TRICARE;

b.    to violate 42 U.S.C. § 1320a-7b(b)(1), by knowingly and willfully soliciting and receiving remuneration, specifically, bribes and kickbacks, directly and indirectly, overtly and covertly, in return for referring individuals to FPMC and to physicians who performed medical procedures at the hospital for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, namely, FECA and TRICARE;

c.    to violate 42 U.S.C. § 1320a-7b(b)(1), by knowingly and willfully soliciting remuneration, specifically, bribes and kickbacks, directly and indirectly, overtly and covertly, in return for referring individuals to non-FPMC facilities for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, namely, Medicare and Medicaid; and

d.    to violate 18 U.S.C. § 1952 by using and causing to be used facilities in interstate commerce with the intent to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of unlawful activity, specifically, Commercial Bribery in violation of Texas Penal Code § 32.43, and thereafter, to perform and attempt to perform acts to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of such unlawful activity.

## Purposes of the Conspiracy

44.    It was a purpose of the conspiracy for **Toussaint, Barker, Beauchamp, Burt**, and certain other coconspirators, including FPMC investors and employees, to unlawfully enrich themselves and others through the submission of private, out-of-network insurance claims, and FECA and TRICARE claims, for services provided to beneficiaries at FPMC, which had been induced by bribes and kickbacks paid, or promised to be paid, to surgeons, primary care physicians, chiropractors, lawyers, workers' compensation preauthorization specialists, and others.

45.    It was a purpose of the conspiracy for **Barker, Loter, Won, Rimlawi, Kim, Nicholson, Henry, Shah, Foox, Gonzales, Ortiz, Forrest, Hillman, Narosov, Bicklein**, and their coconspirators to unlawfully benefit and enrich themselves through the receipt of bribes and kickbacks from FPMC and others in exchange for referring patients, primarily those with private, out-of-network insurance benefits and FECA and TRICARE insurance benefits, to FPMC or to surgeons who performed medical procedures at the hospital.

46.    It was a purpose of the conspiracy for **Barker, Beauchamp, Andrea Smith, Hempel, Loter, Kim**, and their coconspirators to unlawfully benefit and enrich themselves and others by referring Medicare and Medicaid beneficiaries to non-FPMC facilities in exchange for payment.

## Manner and Means of the Conspiracy

47.    The manner and means by which **Toussaint, Barker, Beauchamp, Burt, Andrea Smith, Hempel, Loter, Jacob, Won, Rimlawi, Kim, Nicholson, Henry, Shah, Foox,**

Indictment – Page 10

**Gonzales**, **Ortiz**, **Forrest**, **Hillman**, **Narosov**, **Bicklein**, and their coconspirators sought to accomplish the objects and purposes of the conspiracy included, among other things:

BRIBE AND KICKBACK PAYMENTS

48.    As part of the conspiracy, the coconspirators engaged in a massive, multi-faceted bribe and kickback scheme.

49.    The purpose of these payments was to incentivize physicians and others to steer patients with both in-network and out-of-network private insurance benefits to FPMC for services so the conspirators, namely, the hospital's owners and managers, could unjustly enrich themselves through the lucrative out-of-network billing.

50.    The bribe and kickback payments were also used to incentivize physicians and others to steer patients with government-funded insurance, namely FECA and TRICARE beneficiaries, to FPMC for services.

51.    Rather than pay bribes and kickbacks for referrals of patients on a procedure-by-procedure basis, the coconspirators generally agreed to pay, and did pay, bribe and kickback recipients based on the anticipated revenue their existing and future surgical cases would generate for the facility's owners, generally approximately 10% of FPMC's expected collections for the procedures.

52.    None of the patients steered to FPMC through bribe and kickback payments consented to this practice nor did the plans and programs that paid for their procedures.

Bribe and Kickback Payments to Surgeons

53.    As part of the conspiracy, FPMC, acting through **Beauchamp**, **Toussaint**, **Barker**, **Burt**, and other coconspirators, agreed to pay, and did pay, surgeons in exchange for referring patients to FPMC as opposed to other facilities.

Indictment – Page 11

54.    Certain coconspirators focused on paying the surgeons who specialized in the highest reimbursing procedures, such as spinal and bariatric surgery, and then billed excessively for those procedures, knowing they would generally be reimbursed based on a percentage of billed charges.

55.    During the hospital's syndication phase, **Beauchamp** and other coconspirators asked surgeons how many surgeries they were doing a month, how many out-of-network surgeries they could steer to FPMC, and what types of insurance their patients had.

56.    This information allowed **Beauchamp** and certain other coconspirators to estimate the profitability of the surgeons' cases to the hospital and its investors.  **Beauchamp** then offered the surgeon a monthly payment in exchange for certain cases, primarily out-of-network, FECA, and TRICARE cases, being performed at FPMC.

57.    Some of the surgeons that received these bribe and kickback payments invested in FPMC.  Others did not.

58.    Defendants **Won**, **Rimlawi**, **Kim**, **Nicholson**, and **Shah** all received bribe and kickback payments in the following approximate amounts in exchange for referring their patients to FPMC:

| BRIBE AND KICKBACK RECIPIENT | AMOUNT RECEIVED |
|---|---|
| Won | $7,000,000 |
| Kim | $4,595,000 |
| Rimlawi | $3,800,000 |
| Nicholson | $3,400,000 |
| Shah | $67,850 |

Indictment – Page 12

59.     The surgeons spent the vast majority of the bribe payments marketing their personal medical practices—which benefited them financially—or on personal expenses, such as cars, diamonds, and payments to family members.

Bribe and Kickback Payments to Primary Care Physicians

60.     As part of the conspiracy, certain coconspirators also paid bribes and kickbacks to around 40 primary care physicians and practices—the vast majority of whom/which were not investors in FPMC—of $500 a month to refer patients to the hospital or to surgeons associated with the hospital.

61.     Many of the surgeons that received bribe and kickback payments from the coconspirators, as well as **Henry**, further benefited by receiving the referrals that the coconspirators "purchased" from primary care physicians.

Bribe and Kickback Payments to Other Referral Sources

62.     In addition to paying surgeons and primary care physicians, certain coconspirators also paid a host of others in exchange for referring patients, including FECA beneficiaries, to FPMC or to surgeons who performed medical procedures, including surgeries, at the hospital.  These bribe and kickback recipients included workers' compensation preauthorization specialists, lawyers, businesses, runners, and chiropractors.  Certain coconspirators also "rented" space in doctors' and chiropractors' offices in outlying cities, including **Foox**'s clinic located in Tyler, Texas, and clinics in Midland and Odessa, in exchange for patients being referred to FPMC or to surgeons who performed medical procedures at the hospital.

63.     The following defendants received bribe and kickback payments, directly or indirectly, in exchange for referring patients as set forth below:

Indictment – Page 13

| BRIBE AND KICKBACK RECIPIENT | AMOUNT RECEIVED |
|---|---|
| Ortiz | approx. $1,100,000 |
| Foox | approx. $500,000 |
| Forrest | approx. $450,000 |
| Gonzales | approx. $385,000 |
| Hillman and Narosov | approx. $190,000 |
| Bicklein | approx. $100,000 |

64.     As part of the conspiracy, many of the surgeons, including **Henry**, who received bribe and kickback payments from FPMC further benefited by receiving the referrals that the coconspirators "purchased" from these referral sources.

Surgery and Referral Tracking

65.     As part of the conspiracy, the coconspirators, via **Andrea Smith**, meticulously tracked referrals and surgeries so bribe and kickback recipients could receive "credit."

66.     **Beauchamp** and certain coconspirators used these tracking documents to assess the value of the bribe and kickback payments in terms of revenue generated and to formulate future bribe payments.

67.     When referral sources received their bribe and kickback checks, they also received in the same envelope a list documenting every referral they sent to FPMC and the surgeon that received the case.

68.     When surgeons and others received their bribe and kickback checks, they also received in the same envelope a list documenting every surgery they brought to FPMC.

Indictment – Page 14

Concealment of Bribes and Kickbacks

69.    To conceal the source and purpose of these bribe and kickback payments, FPMC, acting through its owners and managers, did not directly make the payments. Instead, certain coconspirators used Unique and Adelaide to distribute the funds.

70.    To further conceal the source and purpose of the bribe and kickback payments, FPMC and Adelaide, which made most of the payments, entered into a sham "Management Support and Marketing Agreement" approved by the FPMC Board of Managers, which included **Toussaint** and **Barker**.

71.    The agreement falsely represented, among other things, that (1) Adelaide was purportedly "organized for the purpose of providing investment opportunities and management support and marketing services for medical and related healthcare providers … to the general public in the Greater Dallas, Texas area"; (2) funds received by Adelaide from FPMC would supposedly "be managed and controlled solely by Adelaide"; (3) FPMC purportedly had no right "to exercise control of direction of any nature, kind, or description over the manner or method by which Adelaide perform[ed] its duties"; and (4) Adelaide would "create and publish multi-media advertising (subject to advance FPMC approval)."

72.    In reality, Adelaide (and Unique) did nothing but funnel bribe and kickback payments to surgeons and other referral sources so it did not appear that the payments were coming from FPMC.

73.    On a monthly basis, Unique or Adelaide received a lump-sum check from FPMC, generally signed by **Toussaint**. When the FPMC check was deposited into Adelaide's

Indictment – Page 15

bank account, the data from the check was uploaded to a server in Atlanta, a facility of interstate commerce, after which the check cleared Adelaide's account and it received the funds.

74.     **Beauchamp** then provided **Andrea Smith** or **Jacob** a list of individuals and entities along with dollar amounts that each were to be paid, who then cut checks accordingly.

75.     Both **Andrea Smith** and **Jacob** received a portion of the funds that were funneled through Unique and Adelaide, respectively.

76.     To further conceal the source and purpose of the bribe and kickback payments, the coconspirators created "marketing service agreements" or similarly termed agreements between Adelaide and several of the bribe and kickback recipients or with entities they used to receive the payments.

77.     Generally, these agreements—which were almost never signed—represented, among other things, that the bribe and kickback recipient was being paid by Adelaide to provide marketing services for FPMC, and that the payments had nothing to do with the referral of patients to the hospital.

78.     In reality, the bribe and kickback payments were made to induce patient referrals and to induce surgeons to bring their surgical cases to the hospital.  For example, on December 26, 2011, **Beauchamp** sent an email to an unindicted coconspirator, a chiropractor, stating it "appears that your projections of cases have fallen whole-fully short.  You said 20 in November and 40 in December.  I want to sit down as soon after the beginning of the year and before the 15th to find out why my $150k investment has not produced Jack."

**Indictment – Page 16**

79.     Further, the recipients of bribe and kickback payments used the funds for their personal or business benefit.  Indeed, once the money left FPMC, the hospital had no control over it, and FPMC did little to nothing to regulate the money's use as long as its intended purpose—the referral of patients to the hospital for surgery—was effectuated.

Bribe and Kickback Payments Funneled Through Entity A

80.     In addition to Unique and Adelaide, certain coconspirators also used Entity A, a real estate management company, to funnel bribe and kickback payments to surgeons, specifically, **Henry**.

81.     During the conspiracy period, **Henry** received, directly or indirectly, approximately $840,000 in bribe and kickback payments in exchange for referring patients, including FECA beneficiaries, to FPMC.

INDUCEMENT BY WAIVING OR SUBSTANTIALLY REDUCING
COINSURANCE OR PATIENT-RESPONSIBILITY PAYMENT

82.     As part of the conspiracy, and under the direction of **Burt**, certain conspirators, as a further inducement to bribe and kickback recipients, and in an effort to induce patients with in-network and out-of-network benefits to receive services at FPMC against what would ordinarily be their financial interests, often did not collect or even attempt to collect the patients' coinsurance or patient-responsibility payment due and owing under their out-of-network benefits.

83.     Instead patients and bribe and kickback recipients were routinely guaranteed by certain coconspirators prior to surgery that patients' total out-of-pocket expenses would be no more than they would be at an in-network facility, despite the fact that FPMC

intended to, and did, bill the patients' plans and programs at higher out-of-network rates and were reimbursed accordingly.

84.    As part of the conspiracy, certain coconspirators (1) instructed surgeons and their staffs exactly how to address the fact that FPMC was out-of-network; (2) during pre-admission/pre-registration, it was reiterated to the patient that even though the hospital was out-of-network, the patient would "receive in-network benefits"; and (3) reassured the patient again when they were released that they would not be charged or pay out-of-network costs.

85.    Patients were also falsely told that the explanation of benefits (EOB) they would receive from their insurer would show FPMC as an out-of-network facility and contain an "incorrect" patient-responsibility payment. To prevent patients from tipping off their plans, certain coconspirators told patients to call the hospital directly when they received their EOB so their bill could be "corrected."

86.    Certain coconspirators actively concealed their true policy regarding coinsurance and patient-responsibility payment from patients' plans and programs. As one example, on or about February 14, 2011, **Burt** forwarded an email to **Beauchamp** laying out FPMC's true policy regarding out-of-network patient responsibility. **Burt** told **Beauchamp** "I would not … send this out in writing to the Southlake docs. I imagine you agree. If it landed in the insurance companies' hands we may be sorry."

87.    Certain coconspirators, in a further attempt to conceal their fraud, wrote off the patient responsibility as bad debt on their accounting books knowing that they never intended to collect the payments.

88.    In addition to fraudulently concealing their true policy regarding out-of-network patient responsibility, certain coconspirators also fraudulently submitted inflated charges to the plans and programs as a result of waiving or reducing patient coinsurance upfront. This caused the plans and programs to consistently reimburse FPMC based on false and inflated charges.

89.    As a result of this aspect of the conspiracy, thousands of patients chose to have the exact same procedure performed by the exact same doctor at a facility where, absent the scheme, the costs would likely have been financially prohibitive.  And the coconspirators reaped the benefits, not only via patients who otherwise likely would not have come to FPMC, but also by billing for them at inflated out-of-network rates.

Other Inducements

90.    Certain coconspirators, as part of the conspiracy, offered a number of other inducements to patients, surgeons, and other referral sources to steer patients to the hospital.

91.    To induce out of town patients to come to FPMC, certain coconspirators paid for patients' travel and lodging, either directly or through gift cards.

92.    To further induce surgeons and other referral sources to steer patients to the facility, certain conspirators provided tickets to sporting events; custom made cowboy boots; discounts on diamonds; free car washes; free high-end dining; and deals on medical office building space; and made investment in FPMC, and the number of shares received, contingent on the number of referrals to the hospital and/or surgeries performed at the hospital.

93.    Some coconspirators also permitted surgeons to use medical supplies from their own companies during procedures, allowing the surgeons to reap even more financial benefit through payment for those products.

SELLING MEDICARE REFERRALS

94.    As part of the conspiracy, certain coconspirators, including **Beauchamp**, **Barker**, **Andrea Smith**, **Hempel**, **Loter**, **Kim**, and several unindicted coconspirators, also attempted to refer patients with lower-reimbursing insurance coverage, namely Medicare and Medicaid beneficiaries, to other facilities in exchange for cash.

**Effects of the Conspiracy**

95.    As a result of the conspiracy, thousands of patients were steered to FPMC, where the same surgeon performed the same services that the patient would have received at an in-network facility, but at many multiples of the cost to the patient's insurance plan.

96.    In total, FPMC paid around $40 million in bribes and kickbacks during the conspiracy, roughly half of which was paid to individuals and entities that did not invest in FPMC.

97.    The bribes and kickbacks resulted in the victim plans and programs being billed well over half-a-billion dollars, including over $10 million to TRICARE, over $25 million to FECA, and over $60 million to FEHBP, and FPMC collecting in excess of two hundred million dollars in tainted and unlawful claims.

Indictment – Page 20

## Overt Acts
### (Paragraphs 99 through 145)

98.     In furtherance of the conspiracy, and to accomplish its object and purpose, the coconspirators committed and caused to be committed, in the Dallas Division of the Northern District of Texas, the following overt acts, among many others:

BRIBE AND KICKBACK PAYMENTS
TO SURGEONS AND REFERRAL SOURCES

99.     On or about January 13, 2009—two months before FPMC opened—**Burt** sent a spreadsheet to **Beauchamp** with proposed monthly payments for **Barker**, **Nicholson**, **Kim**, **Ortiz**'s clinic, and **Hillman**'s and **Narosov**'s company, along with expected monthly surgeries or referrals from each.

100.    On or about December 29, 2008, **Loter** sent **Beauchamp** and **Hempel** an email entitled "Mike Rimlawi & Doug Won," stating that "I have them VERY interested in talking to you guys about coming over to Forest Park Medical Center and doing surgeries.... I feel we can get these guys on board with this, but they just want to be sure all is good and understand a little more about your future plans and what kind of marketing dollars would be involved for the two of them at first and then for all of them when they bring on the other two surgeons."

101.    On or about January 16, 2009, an employee of **Loter**'s advertising agency sent **Beauchamp** and **Burt** an email on behalf of **Won** and **Rimlawi**, stating "One thing that Doug and Mike wanted to understand clearly is what the sliding scale for marketing dollar contributions looks like.... Knowing that the 100K covers 20-25 cases/month, they would like to understand the levels that can be achieved when they bring in even more cases" to FPMC.

Indictment – Page 21

102.    On or about March 11, 2009, **Beauchamp**, **Toussaint**, **Barker**, **Burt**, **Jacob**, and some of their coconspirators paid and caused the payment of $100,000 to **Loter**'s advertising agency on **Won**'s and **Rimlawi**'s behalves in exchange for **Won** and **Rimlawi** referring patients to FPMC.

103.    On or about June 16, 2010, **Beauchamp** sent **Barker** an email attaching a list entitled "June Marketing" and stated "We can discuss any of this tomorrow at our 8AM." Among other things, the list showed payments of $250,000 to **Won** and **Rimlawi**, $60,000 to **Ortiz**'s clinic, $8,000 to **Foox**'s wife, and $7,500 to **Bicklein**.

104.    On or about December 21, 2010, **Beauchamp**, **Toussaint**, **Barker**, **Burt**, **Jacob**, and some of their coconspirators paid and caused the payment of $50,000 to **Won** in exchange for **Won** referring patients to FPMC.

105.    On or about July 21, 2011, **Beauchamp**, **Toussaint**, **Barker**, **Burt**, **Jacob**, and some of their coconspirators paid and caused the payment of $112,500 to **Rimlawi** in exchange for **Rimlawi** referring patients to FPMC.

106.    On or about February 11, 2009—before FPMC opened—**Beauchamp**, **Toussaint**, **Barker**, **Burt**, **Jacob**, and some of their coconspirators paid and caused the payment of $70,000 to **Loter**'s advertising agency on **Nicholson**'s behalf in exchange for **Nicholson** referring patients to FPMC.

107.    On or about October 15, 2009, **Barker** sent **Beauchamp** an email asking "How is Nick [**Nicholson**] doing re cases for his 70 k. As I recall we had to do 15 insurance bypass a month for 70 k @ at" XXXX. It should be no lower bar for [FPMC] since he is also getting paid by the partnership."

108. On or about March 15, 2009, **Beauchamp** sent **Barker** an email noting payments of $60,000 to **Ortiz**'s clinic and $25,000 to **Bicklein** and others in Midland and Odessa. **Beauchamp** told **Barker**, **Ortiz**'s clinic "sends us a lot of spine, general ortho, and hands" and "preauths Midland Odessa."

109. On September 17, 2009, **Beauchamp**, **Jacob**, and some of their coconspirators paid and caused the payment of $60,000 to **Ortiz** in exchange for **Ortiz** referring patients, including FECA beneficiaries, to FPMC or to surgeons who performed medical procedures at the hospital.

110. On or about July 6, 2010, **Smith** sent an email to **Beauchamp** entitled "[**Ortiz**'s clinic] Update for last week," showing "Referrals – 11" and "Surgeries 2."

111. On or about October 30, 2009, **Beauchamp**, **Jacob**, and some of their coconspirators paid and caused the payment of $7,500 to **Bicklein** in exchange for **Bicklein** referring patients to FPMC or to surgeons who performed medical procedures at the hospital.

112. On or about March 17, 2010, **Bicklein** sent **Smith** an email entitled "Referrals." **Bicklein** told **Smith** "Just looking over list from today…. I know I had several surgeries during this period and the absence of records showing that we did concerns me." **Bicklein** also explained "I send you everything I can … send nothing anywhere else."

113. On April 21, 2010, **Beauchamp**, **Jacob**, and some of their coconspirators paid and caused the payment of $13,000 to **Foox** in exchange for **Foox** referring patients, including FECA beneficiaries, to FPMC or to surgeons who performed medical procedures at the hospital.

114.    On or about August 30, 2012, **Beauchamp**, **Jacob**, and some of their coconspirators paid and caused the payment of $13,300 to **Foox** in exchange for **Foox** referring patients to FPMC or to surgeons who performed medical procedures at the hospital.

115.    On or about November 30, 2012, **Foox**, after being informed that he would no longer receive payments, sent an email to a FPMC representative stating "I am sure the courts will find the information very interesting given the facts of the matter if and when it gets to that point.  It is clear to all reasonable persons what this contract [to "lease" his office] represented and who did benefit from it ie FPMC as evidenced by the monthly reports sent to me from FPMC/Andrea Smith."

116.    On July 16, 2010, **Beauchamp**, **Jacob**, and some of their coconspirators paid and caused the payment of $10,000 to **Gonzales** in exchange for **Gonzales** referring patients to FPMC or to surgeons who performed medical procedures at the hospital.

117.    On or about August 25, 2010, **Hillman** sent an email to **Beauchamp** and **Smith** claiming "credit" for a doctor's case at FPMC and telling **Smith** "we worked a deal with him to get his business.  We received permission from alan to do this mam."

118.    On or about September 17, 2010, **Beauchamp**, **Jacob**, and some of their coconspirators paid and caused the payment of $40,000 to **Hillman** and **Narosov** in exchange for **Hillman** and **Narosov** referring patients, including FECA beneficiaries, to FPMC or to surgeons who performed medical procedures at the hospital.

119.    On or about July 12, 2010, **Forrest** sent an email to **Smith** asking "How do the commissions work?  I am on commission for a percentage of the surgeries that I send

over (just mine)." **Smith** responded, "We've already figured it. I need an invoice for 10K from you."

120. On or about July 19, 2010, **Beauchamp, Jacob**, and some of their coconspirators paid and caused the payment of $10,000 to **Forrest** in exchange for **Forrest** referring patients to FPMC or to surgeons who performed medical procedures at the hospital.

121. On or about February 23, 2011, **Beauchamp, Jacob**, and some of their coconspirators paid and caused the payment of $27,500 to **Forrest** in exchange for **Forrest** referring patients, including FECA beneficiaries, to FPMC or to surgeons who performed medical procedures at the hospital.

122. On or about April 1, 2009, **Kim** sent **Beauchamp** an email stating "I have a business proposal for you…. I truly believe that you will receive a 9:1 ratio or greater for every dollar you invest in me. I am requesting a marketing budget of $70,000 a month."

123. On or about July 26, 2012, **Beauchamp, Toussaint, Barker, Burt, Jacob**, and some of their coconspirators paid and caused the payment of $175,000 to **Kim** in exchange for **Kim** referring patients to FPMC.

124. On or about September 10, 2012, **Kim** sent an email to **Beauchamp** and **Toussaint** lamenting the reduction in his monthly payments from $175,000 to $125,000, explaining "We send our Ft Worth patients to [FPMC] for CTs, EGDs, readmissions for numerous medical conditions like fever, dehydration, pain control, and gallbladder attacks. Basically, anything we can-both the patient and we as surgeons pass up 6 hospitals on our way to FP for medical conditions that could be treated locally."

Indictment – Page 25

125.    On or about September 28, 2012, **Beauchamp**, **Toussaint**, **Barker**, **Burt**, **Jacob**, and some of their coconspirators paid and caused the payment of $125,000 to **Kim** in exchange for **Kim** referring patients to FPMC.

126.    On or about March 3, 2011, **Beauchamp**, **Jacob**, and some of their coconspirators paid and caused the payment of $6,500 to **Shah** in exchange for **Shah** referring patients to FPMC.

127.    On or about April 20, 2011, **Shah** sent an email to **Jacob** entitled "Revenue" claiming that he had been "shorted" certain patients and noting that "10% was the number told to me by you and [**Beauchamp**] and that doesn't even match these numbers."

BRIBE AND KICKBACK PAYMENTS
TO PRIMARY CARE PHYSICIANS AND PRACTICES

128.    Certain coconspirators caused the following payments, among others, to be made to primary care physicians and practices in exchange for referring patients to FPMC or to surgeons who performed medical procedures, including surgeries, at the hospital:

| DATE | PAYMENT |
| --- | --- |
| On or about April 27, 2011 | $1000 to primary care physician Y.L. for two offices |
| On or about July 29, 2011 | $500 each to three primary care physicians, D.B., H.A., and J.D., and $1000 to primary care physician Y.L for two offices |
| On or about August 1, 2011 | $500 each to three primary care physicians, C.D., I.O., and S.L. |
| On or about November 17, 2011 | $500 each to two primary care physicians, J.T. and H.A. |
| On or about January 30, 2012 | $500 to a primary care physician, N.R. |
| On or about April 20, 2012 | $500 each to three primary care physicians, L.S., M.M., and M.A. |

Indictment – Page 26

| On or about May 22, 2012 | $500 each to three primary care physicians, I.P., J.B., and M.M, and $1000 for two offices of C.D.U.C. |
|---|---|

BRIBE AND KICKBACK PAYMENTS FUNNELED THROUGH ENTITY A

129.    On or about April 29, 2009, **Beauchamp** sent **Henry** an email attaching a million dollar a year "on-call" spine surgeon agreement for FPMC's emergency room, telling **Henry** "See how this works."

130.    Thereafter, some of the coconspirators hatched a plan under which FPMC would pay Entity A $35,000 a month.  Entity A, in turn, would pay **Henry** $30,000 a month pursuant to a sham consulting agreement executed between **Henry** and Entity A on August 1, 2009.  The agreement represented that Entity A was retaining **Henry** as a "consultant to assist [Entity A] in its real estate development projects."

131.    On or about July 31, 2009—the day before the sham consulting agreement was executed—**Beauchamp** sent **Burt** an email stating that **Toussaint** and **Barker** "are OK with the Shawn Henry agreement."

132.    Entity A's $30,000 monthly payments to **Henry** were made in exchange for his bringing surgical cases to FPMC, including cases that would be paid by FECA.  Henry provided no services to Entity A in exchange for the monthly $30,000 payments he received from the company.

133.    The sham consulting agreement was also used to secure a loan for **Henry** through a bank so he could invest in FPMC, a further benefit he received in exchange for his patients.

Indictment – Page 27

134.    On or about July 17, 2009, **Burt** sent an email to a banker, copying **Beauchamp**, stating, "As we discussed earlier this week, We will be proceeding with a $366,000 annual consulting agreement with Dr. Henry.  It will be paid monthly.  Let me know if that gets his $500k financing done."

135.    **Barker** and **Toussaint**, the principal owners of Entity A, split the remaining $5000 monthly payment that Entity A received from FPMC for their efforts.

SELLING MEDICARE AND MEDICAID PATIENTS

136.    On or about September 16, 2009, a member of **Barker**'s staff sent an email to **Beauchamp** stating, "Yo Yo! We have a super fresh Medicare patient ready for surgery. Dr. Barker said he worked a deal with you regarding Medicare peeps.  Please add this lady to the Medicare list."

137.    On or about November 3, 2009, **Loter** sent **Barker** an email asking, "Do we still need to chat about Medicare?  I would like to get started.  Just need to hammer out cost split!!"

138.    On or about November 2, 2009, **Loter** sent an email to **Barker, Beauchamp**, and **Hempel** attaching a document entitled "MedicareLeads.pdf" and stating "Here is the process/protocol we wrote up for handling the Medicare going forward….  We are ready to get started."

139.    On or about December 9, 2009, a member of **Kim**'s staff sent **Kim** an email reporting that 33 "medicare/medicaid" leads received by their office had been faxed to **Hempel** at FPMC.

Indictment – Page 28

140. On or about December 9, 2009, **Kim** sent **Beauchamp** an email asking "what about all these Medicare leads?  When can we expect to see a check for these people.  Thx David."

141. On a date unknown to the Grand Jury, **Loter** and **Hempel** met with representatives of Hospital B to discuss referring Medicare and Medicaid patients to Hospital [B] in exchange for payments.

142. On or about February 3, 2010, **Hempel** sent an email to **Kim** and members of **Barker**'s staff, copying **Loter**, stating "I have finalized a Medicare referral deal with Hospital [B]" for "$350 per lead."  In the email, **Hempel** also set out the steps of the referral process.  On or about February 3, 2010, a member of **Barker**'s staff forwarded **Hempel**'s email to **Barker**.

143. On or about February 4, 2010, a member of **Barker**'s staff sent **Beauchamp** and **Hempel** an email stating "Dr. Barker would like to know if you can work a special deal just for us.  He is not comfortable accepting less than $500.00 per lead."

144. On or about February 4, 2010, **Hempel** sent an email to a member of **Barker**'s staff and **Beauchamp** stating, "After speaking with Alan, we both agree that $350 is a good starting point.  If they are truly able to convert many of these into surgeries, we can definitely re-negotiate the rate."

145. The coconspirators also committed the overt acts set forth in Counts Two through Eighteen of this Indictment, which paragraphs are incorporated by reference as if set forth fully in this Count.

All in violation of 18 U.S.C. § 371.

**Counts Two through Eleven**
**Offering or Paying and Soliciting or Receiving**
**Illegal Remuneration and Aiding and Abetting**
**[Violations of 42 U.S.C. § 1320a-7b(b) and 18 U.S.C. § 2]**

146.    Paragraphs 1 through 145 of this Indictment are realleged and incorporated by reference as if set forth fully herein.

147.    From on or about November 15, 2011 through in or about January 2013, the exact dates being unknown to the Grand Jury, within the Dallas Division of the Northern District of Texas and elsewhere, the defendants, **Toussaint**, **Barker**, **Beauchamp**, **Burt**, **Jacob**, **Won**, **Henry**, **Gonzales**, **Shah**, **Forrest**, **Kim**, **Shah**, **Rimlawi**, and **Nicholson**, aiding and abetting one another and others known and unknown to the Grand Jury, as set forth below, did knowingly and willfully offer and pay and did knowingly and willfully solicit and receive remuneration, specifically, bribes and kickbacks, directly and indirectly, overtly and covertly, to induce the recipients to refer, and in return for referring, individuals to FPMC and to physicians who performed medical procedures at the hospital for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, namely, FECA and TRICARE, each payment forming a separate count:

| COUNT | BRIBE OR KICKBACK PAYORS | BRIBE OR KICKBACK RECIPIENT | DATE BRIBE OR KICKBACK CLEARED BANK | AMOUNT OF BRIBE OR KICKBACK | FECA OR TRICARE BENEFICIARY AND DATE OF SERVICE(S) AT FPMC (ON OR ABOUT) |
|---|---|---|---|---|---|
| 2 | Beauchamp, Toussaint, Barker, Burt, | Won | On or about 11/17/2011 | $112,500 | TRICARE beneficiary C.D., |

| | | | | | |
|---|---|---|---|---|---|
| | and **Jacob**, aiding and abetting one another | | (check #1924) | | 12/9/2011 and 12/13/2011 |
| 3 | **Beauchamp** | **Gonzales** | On or about 12/7/2011 (check #1932) | $10,000 | FECA beneficiary J.M, 12/14/2011-12/15/2011 |
| 4 | **Beauchamp** and **Jacob**, aiding and abetting one another | **Shah** | On or about 2/27/2012 (check #2100) | $3,000 | FECA beneficiaries, G.A., P.C., J.M. (1/17/2012), and K.J. (1/31/2012) |
| 5 | **Beauchamp** | **Forrest** | On or about 2/21/2012 (check #2080) | $22,500 | FECA beneficiary M.A., 1/24/2012 and 2/3/2012 |
| 6 | **Beauchamp, Toussaint, Barker, Burt,** and **Jacob**, aiding and abetting one another | **Kim** | On or about 2/27/2012 (check #2072) | $150,000 | TRICARE beneficiary V.R. 3/20/2012-3/22/2012 |
| 7 | **Beauchamp** and **Jacob**, aiding and abetting one another | **Shah** | On or about 5/4/2012 (check #2202) | $1,000 | FECA beneficiaries, P.M. and N.Y., 3/20/2012 |
| 8 | **Beauchamp, Toussaint, Barker, Burt,** and **Jacob**, aiding and abetting one another | **Rimlawi** | On or about 1/30/2012 (check #2014) | $175,000 | FECA beneficiary D.H., between 2/1/2012 and 2/17/2012 |
| 9 | **Beauchamp, Toussaint, Barker, Burt,** and **Jacob**, aiding and | **Rimlawi** | On or about 3/20/2012 (check #2115) | $175,000 | FECA beneficiary A.A., between 4/2/2012 and 4/12/2012 |

Indictment – Page 31

| | | | | | |
|---|---|---|---|---|---|
| | abetting one another | | | | |
| 10 | **Beauchamp** and **Jacob**, aiding and abetting one another | **Shah** | On or about 5/31/2012 (check #2248) | $1,000 | FECA beneficiaries M.Y. (5/15/2012), C.S., N.Y. (5/22/2012), and T.M. (6/12/2012) |
| 11 | **Beauchamp**, **Toussaint**, **Barker**, **Burt**, and **Jacob** aiding and abetting one another | **Nicholson** | On or about 7/24/2012 (check #2330) | $100,000 | TRICARE beneficiary M.S., 8/1/2012 and 8/7/2012- 8/8/2012 |

All in violation of 42 U.S.C. § 1320a-7b(b) and 18 U.S.C. § 2.

### Counts Twelve through Eighteen
### Travel Act and Aiding and Abetting (Commercial Bribery)
### [Violations of 18 U.S.C. §§ 1952 and 2]

148.    Paragraphs 1 through 147 of this Indictment are realleged and incorporated by reference as if set forth fully herein.

149.    From on or about November 15, 2011 through in or about January 2013, the exact dates being unknown to the Grand Jury, within the Dallas Division of the Northern District of Texas and elsewhere, the defendants, **Toussaint**, **Barker**, **Beauchamp**, **Burt**, **Jacob**, **Henry**, **Kim**, **Foox**, **Won**, **Gonzales**, and **Nicholson**, aiding and abetting one another and others known and unknown to the Grand Jury, used and caused to be used facilities in interstate commerce with the intent to promote, manage, establish, carry on, distribute the proceeds of, and facilitate the promotion, management, establishment, carrying on, and distribution of the proceeds of an unlawful activity, that is, Commercial

Indictment – Page 32

Bribery in violation of Texas Penal Code § 32.43, and thereafter, to perform and attempt

to perform acts to promote, manage, establish, carry on, distribute the proceeds of, and

facilitate the promotion, management, establishment, carrying on, and distribution of the

proceeds of such unlawful activity as follows:

| COUNT | BRIBE OR KICKBACK PAYORS | BRIBE OR KICKBACK RECIPIENT | USE OF FACILITY IN INTERSTATE COMMERCE | ACTS PERFORMED THEREAFTER | CHECK # |
|---|---|---|---|---|---|
| 12 | **Beauchamp**, **Toussaint**, **Barker**, and **Burt**, aiding and abetting one another | **Henry** | On or about November 29, 2011, **Beauchamp**, **Toussaint**, **Barker**, and **Burt** caused a $35,000 check from FPMC to be deposited into a bank account controlled by Entity A, causing the Federal Reserve Bank to route the $35,000 over a computer network from FPMC's bank to Entity A's bank | On or about December 8, 2011, a $30,000 check from Entity A cleared **Henry**'s bank account. The payment was made to **Henry** in exchange for his referring patients to FPMC as opposed to other facilities. | #5095 |
| 13 | **Beauchamp**, **Toussaint**, **Barker**, **Burt**, and **Jacob**, aiding and abetting one another | **Kim** | On or about November 14, 2011, **Beauchamp** sent an email to **Jacob** with dollar amounts to pay various bribe and | On or about December 5, 2011, a check for $125,000 cleared a bank account controlled by **Kim**. The payment was | #1928 |

Indictment – Page 33

| | | | | | |
|---|---|---|---|---|---|
| | | | kickback recipients, including $125,000 to a company controlled by **Kim**. | made to **Kim** in exchange for his referring patients to FPMC as opposed to other facilities. | |
| 14 | **Beauchamp** and **Jacob**, aiding and abetting one another | **Foox** | On or about May 14, 2012, **Beauchamp** sent an email to **Jacob** with dollar amounts to pay various bribe and kickback recipients, including $8,000 to **Foox**'s wife and $5,000 to an entity controlled by **Foox**. | On or about May 25, 2012, two checks totaling $13,000 cleared bank accounts associated with **Foox**. The payment was made to **Foox** in exchange for his referring patients to FPMC or to surgeons who performed medical procedures at the hospital. | #2217 and #2216 |
| 15 | **Beauchamp**, **Toussaint**, **Barker**, **Burt**, and **Jacob**, aiding and abetting one another | **Won** | On or about June 13, 2012, **Beauchamp** sent an email to **Jacob** with dollar amounts to pay various bribe and kickback recipients, including $225,000 to a company controlled, in part, by **Won**. | On or about June 22, 2012, two checks for $112,500 cleared a bank account controlled, in part, by **Won**. The payment was made to **Won** in exchange for his referring patients to FPMC as opposed to other facilities. | #1014 and #2307 |

**Indictment – Page 34**

| 16 | **Beauchamp** and **Jacob**, aiding and abetting one another | **Gonzales** | On or about June 13, 2012, **Beauchamp** sent an email to **Jacob** with dollar amounts to pay various bribe and kickback recipients, including $10,000 to a company controlled by **Gonzales**. | On or about June 25, 2012, a check for $10,000 cleared a bank account controlled by **Gonzales**. The payment was made to **Gonzales** in exchange for his referring patients to FPMC or to surgeons who performed medical procedures at the hospital. | #2314 |
| 17 | **Beauchamp**, **Toussaint**, **Barker**, **Burt**, and **Jacob**, aiding and abetting one another | **Nicholson** | On or about July 13, 2012, **Beauchamp** sent an email to **Jacob** with dollar amounts to pay various bribe and kickback recipients, including $100,000 to a company controlled by **Nicholson**. | On or about July 24, 2012, a check for $100,000 cleared a bank account controlled by **Nicholson**. The payment was made to **Nicholson** in exchange for his referring patients to FPMC as opposed to other facilities. | #2330 |
| 18 | **Beauchamp** and **Jacob**, aiding and abetting one another | **Foox** | On or about July 13, 2012, **Beauchamp** sent an email to **Jacob** with dollar amounts to pay various bribe and | On or about July 23, 2012, two checks totaling $13,000 cleared bank accounts associated with | #2334 and #2333 |

| | | kickback recipients, including $8,000 to **Foox**'s wife and $5,000 to an entity controlled by **Foox**. | **Foox**. The payment was made to **Foox** in exchange for his referring patients to FPMC or to surgeons who performed medical procedures at the hospital. | |
|---|---|---|---|---|

## Count Nineteen
### Conspiracy to Commit Laundering of Monetary Instruments
### [Violation of 18 U.S.C. § 1956(h)]

150.    Paragraphs 1 through 149 of this Indictment are realleged and incorporated by reference as if set forth fully herein.

151.    From in or around June 2009 through in or about January 2013, the exact dates being unknown to the Grand Jury, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants, **Beauchamp**, **Toussaint**, **Barker**, **Burt**, and **Jacob**, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of 18 U.S.C. § 1956, to wit: to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, violations of 18 U.S.C. § 1952, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions

Indictment – Page 36

represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

## Purposes of the Conspiracy

152.   It was a purpose of the conspiracy for **Toussaint**, **Barker**, **Beauchamp**, **Burt**, **Jacob**, and some of their coconspirators to engage in money laundering to conceal and disguise the ownership and control of the proceeds of the bribery and kickback scheme so those proceeds could be used to make further bribe and kickback payments to surgeons and other referral sources without it appearing as if the payments were coming from FPMC.

153.   It was a purpose of the conspiracy for **Toussaint**, **Barker**, **Beauchamp**, **Burt**, **Jacob**, and some of their coconspirators to engage in money laundering to unlawfully enrich themselves and their coconspirators.

## Manner and Means of the Conspiracy

154.   The manner and means by which the defendants and some of their coconspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

155.   The coconspirators caused FECA, TRICARE, and private insurance plans and programs to electronically transfer funds into FPMC's operating account, which was controlled by **Toussaint**, **Beauchamp**, **Burt**, and others, as payment for claims that the coconspirators had submitted under the taint of bribes and kickbacks.

156.   **Toussaint**, **Barker**, **Beauchamp**, and **Burt** then transferred and caused the transfer of a portion of those criminally derived proceeds from FPMC's operating account to Adelaide's bank accounts, which were controlled by **Jacob**. The purpose of

Indictment – Page 37

this transfer was to conceal and disguise the source of the criminally derived proceeds so they could be used to finance future bribe and kickback payments without it appearing as if FPMC was the source.

157.    At **Beauchamp**'s direction, **Jacob** then paid and caused to be paid a portion of the criminally derived proceeds as bribe and kickback payments to surgeons and other referral sources in exchange for those individuals' referring patients to FPMC so some of the coconspirators could submit additional fraudulent claims to the plans and programs and reap the ill-gotten gains.

All in violation of 18 U.S.C. § 1956(h).

### Count Twenty
### Conspiracy to Commit Laundering of Monetary Instruments
### [Violation of 18 U.S.C. § 1956(h)]

158.    Paragraphs 1 through 157 of this Indictment are realleged and incorporated by reference as if set forth fully herein.

159.    Beginning in 2009, the exact date being unknown, and continuing through December of 2011, in the Dallas Division of the Northern District of Texas and elsewhere, the defendants, **Beauchamp**, **Toussaint**, **Barker**, **Burt**, and **Henry**, did knowingly combine, conspire, and agree with each other and with other persons known and unknown to the Grand Jury to commit offenses against the United States in violation of 18 U.S.C. § 1956, to wit: to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, violations of 18 U.S.C. § 1952, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified

**Indictment – Page 38**

unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

### Purposes of the Conspiracy

160.   It was a purpose of the conspiracy for **Toussaint**, **Barker**, **Beauchamp**, **Burt**, and **Henry** to engage in money laundering to conceal and disguise the source, ownership, and control of bribe and kickback payments made by FPMC, acting through **Toussaint**, **Barker**, **Beauchamp**, and **Burt**, to **Henry** in exchange for **Henry** bringing surgical cases to the hospital.

161.   It was a purpose of the conspiracy for **Toussaint**, **Barker**, **Beauchamp**, **Burt**, and **Henry** to engage in money laundering to unlawfully enrich themselves and their coconspirators.

### Manner and Means of the Conspiracy

162.   The manner and means by which the defendants and some of their coconspirators sought to accomplish the object and purpose of the conspiracy included, among other things:

163.   In or around August 2009, the exact date being unknown, FPMC, acting through **Toussaint**, **Barker**, **Beauchamp**, and **Burt**, intentionally and knowingly offered to pay, and **Henry** intentionally and knowingly agreed to accept, $30,000 a month in exchange for bringing surgical cases to FPMC.

164.   To conceal and disguise the source of **Henry**'s bribe and kickback proceeds, FPMC did not directly make the $30,000 monthly payments to **Henry**.

**Indictment – Page 39**

165.    Instead, pursuant to a sham consulting agreement between FPMC and Entity A, **Toussaint**, **Barker**, **Beauchamp**, and **Burt**, on a monthly basis, transferred and caused the transfer of Henry's bribe and kickback proceeds, along with an additional $5000, from FPMC's operating account to Entity A's bank account, which was controlled by **Toussaint**, **Barker**, and others.

166.    Pursuant to a sham consulting agreement between Entity A and **Henry**, Entity A, acting through **Toussaint** and **Barker**, then distributed $30,000 to **Henry** on a monthly basis, for a total of approximately $840,000 during the conspiracy period.

167.    By using Entity A as a pass through, some of the coconspirators were able to make it appear as if **Henry**'s $30,000 monthly payments were bona fide consulting fees rather than his proceeds of an unlawful agreement to refer patients to FPMC in exchange for monetary payments.

All in violation of 18 U.S.C. § 1956(h).

## Forfeiture Notice
[18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(7), and 28 U.S.C. § 2461(c)]

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. 2461(c), upon conviction of Counts One and Twelve through Eighteen, the defendants shall forfeit to the United States, any property, real or personal, which constitutes or is derived from proceeds traceable to the Counts, or any property traceable to such property.

Pursuant to 18 U.S.C. § 982(a)(7), upon conviction of Counts Two through Eleven, the defendants shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the Counts, or any property traceable to such property.

Indictment – Page 40

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of Counts Nineteen and Twenty, the defendants shall forfeit to the United States any property, real or personal, involved in the Counts, or any property traceable to such property.

Pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), if any of the property described above, as a result of any act or omission of the defendant:

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    c.     has been placed beyond the jurisdiction of the court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

Indictment – Page 41

A TRUE BILL

_____
FOREPERSON

JOHN R. PARKER
UNITED STATES ATTORNEY

_____
ANDREW O. WIRMANI
Assistant United States Attorney
Texas Bar No. 24052287
KATHERINE PFEIFLE
Assistant United States Attorney
Texas Bar No. 24041912
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Tel:  214.659.8600
Fax: 214.659.8809

**Indictment – Page 42**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

ALAN ANDREW BEAUCHAMP (01)
RICHARD FERDINAND TOUSSAINT, JR. (02)
WADE NEAL BARKER (03)
WILTON MCPHERSON BURT (04)
ANDREA KAY SMITH (05)
CARLI ADELE HEMPEL (06)
KELLY WADE LOTER (07)
JACKSON JACOB (08)
DOUGLAS SUNG WON (09)
MICHAEL BASSEM RIMLAWI (10)
DAVID DAESUNG KIM (11)
WILLIAM DANIEL NICHOLSON IV (12)
SHAWN MARK HENRY (13)
MRUGESHKUMAR KUMAR SHAH (14)
GERALD PETER FOOX (15)
FRANK GONZALES JR. (16)
ISRAEL ORTIZ (17)
IRIS KATHLEEN FORREST (18)
ANDREW JONATHAN HILLMAN (19)
SEMYON NAROSOV (20)
ROYCE VAUGHN BICKLEIN (21)

SEALED INDICTMENT

18 U.S.C. § 371
Conspiracy to Pay and Receive Health Care Bribes and Kickbacks

42 U.S.C. § 1320a-7b(b) and 18 U.S.C. § 2
Offering or Paying and Soliciting or Receiving Illegal Remuneration and Aiding and Abetting

18 U.S.C. §§ 1952 and 2
Travel Act and Aiding and Abetting (Commercial Bribery)

18 U.S.C. § 1956(h)
Conspiracy to Commit Laundering of Monetary Instruments

18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(7), and 28 U.S.C. § 2461(c)
Forfeiture Notice

20 Counts

A true bill rendered

_____

DALLAS                                                    FOREPERSON

Filed in open court this 16th day of November, 2016.

**Warrant to be Issued for all Defendants**

UNITED STATES MAGISTRATE JUDGE
No Criminal Matter Pending